**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LARONDA JUNE BRIGGS,<br><br>                    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                    Defendant. | CASE NO. 1:24-cv-00947<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Laronda June Briggs ("Plaintiff" or "Ms. Briggs") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.    Procedural History

Ms. Briggs filed her DIB and SSI applications on September 21, 2021.  (Tr. 15, 191-206.)  She alleged a disability onset date of July 17, 2021 (Tr. 15, 105, 117, 205), due to depression, anxiety, insomnia, bipolar disorder with possible psychotic disorder, and broken right foot (Tr. 105, 117, 228).  After initial denial by the state agency (Tr. 101-10) and denial upon reconsideration (Tr. 113-20), Ms. Briggs requested a hearing (Tr. 121-25).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on March 8, 2023.  (Tr. 33-60.)  The ALJ

issued an unfavorable decision on May 31, 2023, finding Ms. Briggs not disabled from July 17, 2021, through the date of the decision.  (Tr. 12-32.)  The Appeals Council denied Ms. Briggs's request for review of the ALJ's decision on April 2, 2024, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Ms. Briggs then filed the pending appeal.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 9, 11, 12.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Briggs was born in 1975.  (Tr. 26, 43, 191.)  She has a high school education.  (Tr. 26, 43, 229.)  She moved back to Ohio from West Virginia in May 2021 and lived in her sister's home with her sister and great niece.  (Tr. 43, 354.)  Her past work experience included jobs packing vegetables, inspecting and repackaging car parts, working in home health care, and working as a telephone customer service representative.  (Tr. 26, 43-47.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

On July 16, 2021, Ms. Briggs presented to Emily Louise Exten, M.D., at OhioHealth Orthopedic and Sports Medicine regarding an injury to her right ankle that occurred on July 13, 2021.[1]  (Tr. 454-59.)  She reported injuring herself when she had a seizure and fell between her bed and the wall, and said she went to the emergency room the following day.  (Tr. 455.)  Her ankle was splinted, and she was mostly staying off her ankle and using crutches.  (*Id*.)  X-rays of the right ankle from July 14, 2021, showed a mildly displaced fracture of the distal fibula terminating at the level of the ankle mortise.  (Tr. 319-20, 457.)  Dr. Exten diagnosed closed low lateral malleolus fracture on the right and recommended surgical intervention.  (Tr. 455.)

---

[1] The past medical history included chronic obstructive pulmonary disease (COPD), emphysema, methicillin resistant Staphylococcus aureus (MRSA), osteoarthritis, rheumatoid arthritis, and tuberculosis.  (Tr. 454.)

On July 17, 2021, Ms. Briggs presented to the emergency room at Mansfield Hospital for a psychiatric evaluation.  (Tr. 325.)  She signed herself into the emergency room, reporting that she had not been able to sleep for five days.  (*Id.*)  She was very agitated, had pressured speech, and was babbling at times.  (*Id.*)  She talked about being "between heaven and hell," and sometimes yelled and hit her head.  (*Id.*)  She reported being on psychotropic medications and in treatment when she lived in West Virginia, but said she had had not established care since moving back to Ohio (Tr. 375) in May 2021 (Tr. 354).  Ms. Briggs reported that she recently fractured her ankle during a seizure and was prescribed Norco as needed.  (Tr. 351.)  She reported that she was scheduled for surgery but had been agitated since her injury and started displaying psychosis.[2]  (*Id.*)   Ms. Briggs was attentive on psychiatric examination, but was uncooperative, agitated, aggressive, and combative.  (Tr. 327.)  Her mood was anxious and her affect was angry.  (*Id.*)  Her speech was rapid and tangential.  (*Id.*)  She was paranoid and delusional.  (*Id.*)  Ms. Briggs was admitted to the Mansfield psychiatric unit for further evaluation and treatment.[3]  (Tr. 351, 354, 359.)  She reported: past psychiatric diagnoses of schizophrenia, PTSD, polysubstance abuse, mood disorder, depression, and anxiety; past psychiatric medications of Zoloft, Klonopin, Xanax, and Vistaril; and a past psychiatric hospitalization in West Virginia for about one month.  (Tr. 354.)

During her psychiatric admission, Ms. Briggs had outpatient surgery on her right ankle on July 21, 2021, performed by Dr. Exten.  (Tr 354, 377-78, 460.)  When she returned to the psychiatric unit at Mansfield Hospital on July 22, 2021, she was very agitated, talking nonstop,

---

[2] Ms. Briggs's sister reported that Ms. Briggs had declined since July; she was not taking psychotropic medication and was using marijuana daily.  (Tr. 354.)  During a neurology consultation in September 2022, Ms. Briggs reported that her psychiatric admission in July 2021 was triggered by Prednisone.  (Tr. 559.)

[3] Ms. Briggs was on a waiting list for a transfer to Heartland Hospital because she had out-of-state Medicaid, but she was hospitalized at the Mansfield psychiatric unit after she was declined admission at Heartland Hospital due to her scheduled ankle surgery.  (Tr. 353-54, 380.)

crying, delusional, and religiously preoccupied.  (Tr. 353.)  She did not calm down after being given Haldol and Vistaril.  (*Id*.)  She was then given Ativan.  (*Id*.)  She ultimately calmed down, apologized for her behavior, and appeared less paranoid and delusional.  (*Id*.)  But she was still having difficulty sleeping.  (*Id*.)  On July 22, 2021, Upender Gehlot, M.D., examined Ms. Briggs and observed that she appeared older than her stated aged, needed redirection to engage, had fleeting eye contact, and was restless.  (Tr. 358, 359.)  She was malodorous and unkempt, with poor dentition.  (Tr. 358.)  She was using a wheelchair following her recent ankle surgery and was wearing a boot.  (*Id*.)  Her speech was hyperverbal and her thoughts were tangential and racing.  (*Id*.)  Her mood was irritable and anxious; her affect was labile.  (*Id*.)  Her insight and judgment were poor, her attention was distracted, and her concentration was reduced.  (*Id*.)  Her memory was intact, and she was alert and oriented to person, place, time, and circumstances.  (*Id*.)  She denied suicidal or homicidal ideation and hallucinations.  (*Id*.)  Her fund of knowledge and language were estimated to be low average.  (*Id*.)

Ms. Briggs was discharged from her psychiatric admission on July 26, 2021, with a diagnosis of bipolar disorder, current episode manic severe with psychotic features.[4]  (Tr. 383.)  At discharge, it was noted that Ms. Briggs struggled at the start of her hospitalization, but did better during the latter part of her hospitalization.  (Tr. 381.)  She attended groups, became more social with staff and peers, took care of her activities of daily living, and was able to be redirected.  (*Id*.)  Her sleep was improving, her appetite was within normal limits, she was alert and oriented, and there was no evidence of abnormal thought content or process.  (*Id*.)  At discharge, Ms. Briggs denied feeling hopeless or helpless, aggressive thoughts, thoughts of

---

[4] A "Non-Hospital Problem List" noted a history of nicotine dependence, cigarettes, uncomplicated; rheumatoid arthritis; right upper lobe pulmonary nodule; and positive QuantiFERON-TB Gold test.  (Tr. 360.)

harming others, and pervasive sadness or anhedonia.  (*Id*.)  She reported mild racing thoughts and distractibility, but her psychomotor agitation was significantly reduced.  (*Id*.)

On August 2, 2021, Ms. Briggs presented to Catalyst Life Services ("Catalyst"), seeking counseling, case management, and medication management services.  (Tr. 466-72.)  A diagnostic assessment was completed by clinician Stacey Mong, who was supervised by Katelyn Huff, LPCC-S.  (Tr. 471-72.)  Ms. Briggs reported that her daughters, sisters, and a couple of friends were supportive.  (Tr. 467.)  She reported receiving outpatient counseling services in 2004, and said she had two prior psychiatric hospitalizations for psychosis and manic symptoms; the most recent was from July 21 through July 27, 2021, and the other was in July 2020 for one week. (Tr. 468.)  Her medications included Seroquel, hydroxyzine for anxiety, and oxycodone as needed for her ankle.  (*Id*.)  She reported being a victim of physical and mental abuse as a child. (Tr. 469.)  She complained of pain in her neck, hip, back, feet, and legs.  (Tr. 470.)  She also reported a lack of motivation and a loss of interest in everything she used to enjoy.  (*Id*.)  She was depressed, sad, and anxious, and could go from being happy to sad to angry.  (*Id*.)  She described throwing and hitting things at times and reported problems staying focused and remembering things.  (*Id*.)  She said she was impulsive and reported problems sleeping.  (*Id*.) On examination, Ms. Briggs was alert and oriented x4.  (*Id*.)  She denied suicidal or homicidal thoughts.  (*Id*.)  Ms. Mong concluded that Ms. Briggs would benefit from counseling, case management, and medication management services.  (Tr. 470.)

On August 4, 2021, Ms. Briggs presented to Hannah Finley, PMHNP-BC, at Catalyst for an initial psychiatric evaluation.  (Tr. 473-77.)  She reported having depression and anxiety her whole life, and said she also experienced paranoia and hallucinations since 2020.  (Tr. 473.)  She reported problems remembering things, mood swings, and outbursts that involved yelling.  (*Id*.)

She also reported having seizures for about five years that she said were stress induced.  (*Id.*)
She reported that her appetite was poor.  (*Id.*)  She fell asleep after taking her medication at
night, but only stayed asleep for about two hours before being up and down all night.  (*Id.*)  She
reported past diagnoses of rheumatoid arthritis, osteoarthritis, scoliosis, anxiety, depression,
bipolar disorder, schizophrenia, manic disorder, COPD, and emphysema.  (*Id.*)  She was taking
quetiapine (Seroquel) for unstable mood and hydroxyzine for anxiety.[5]  (Tr. 474.)

On examination, Ms. Briggs was disheveled, her eye contact was avoidant, and her
activity was average.  (Tr. 474-75.)  She sat in a chair, was periodically tearful and upset,
appeared preoccupied with paranoid thoughts, and was agitated but cooperative.  (Tr. 475.)  Her
speech was clear and spontaneous; her language, attention, and memory were intact; she was
oriented to person, place, situation, and time; her thought processes were loose; she was angry,
anxious, and depressed; her affect was constricted; her fund of knowledge was intact; her
cognition was average; and her judgment and insight was poor.  (*Id.*)  She denied current
hallucinations, but reported a visual hallucination two weeks prior that involved two red dots on
the television that nodded at her when the television was turned off.  (*Id.*)  She also reported
persecutory delusions; she thought someone was out to get her, something was not right,
someone was killing her friends and family, and her phone was being overtaken by someone.
(*Id.*)  She denied suicidal, homicidal, and violent ideation.  (*Id.*)  She was diagnosed with
unspecified depressive disorder, unspecified anxiety disorder, and unspecified insomnia
disorder.[6]  (*Id.*)  NP Finley continued quetiapine for mood and hydroxyzine for anxiety, and

---

[5] She reported taking Zoloft in the past and said it worked for her mood until it was increased to 100 mg.  (Tr. 474.)

[6] NP Finley noted that Ms. Briggs might also have some type of bipolar disorder or psychotic disorder, but she left
bipolar / psychotic disorder as a rule out because she felt there was insufficient information provided and/or
insufficient time spent that day to accurately diagnose such a disorder.  (Tr. 475.)

started Zoloft for depression.  (Tr. 476.)  She instructed Ms. Briggs to continue with counseling and to return in three weeks.  (Tr. 478.)

On August 9, 2021, Ms. Briggs returned to Dr. Exten for a post-surgical follow-up visit. (Tr. 460-61.)  She reported that her pain was well controlled, and that she had engaged in weightbearing activity as tolerated with her boot.  (Tr. 460.)  On examination, she was in no acute distress and looked her stated age.  (*Id*.)  Dr. Exten noted mild tenderness to palpation over the incision and decreased ankle motion, but that she was intact neurovascularly.  (Tr. 461.)  Her sutures were removed, and x-rays of the right ankle revealed a stable fibular fracture with internal fixation.  (Tr. 321-22, 461.)

On September 1, 2021, Ms. Briggs returned to NP Finley for medication management. (Tr. 478-81.)  She reported feeling a "little better," with improved sleep and less anxiety after being on medication for over a month, but she was still depressed.  (Tr. 478.)  She said she would sit and ruminate about things; she was upset over the fact that she had moved back to Ohio for a man who had now not talked to her for two weeks; and she was stressed because her sister was undergoing a medical procedure, and her sister was her primary means of transportation.  (*Id*.)  On mental status examination, Ms. Briggs appeared more "put together" than she was at her initial appointment.  (Tr. 479.)  Her speech was normal and her thought processes were logical.  (*Id*.)  Her associations, memory, and language were intact.  (*Id*.)  Her attention/concentration and insight/judgment were fair.  (*Id*.)  Her mood was described as depressed, but less anxious with a congruent affect.  (*Id*.)  She denied suicidal ideation and hallucinations, and her paranoid thoughts had decreased.  (*Id*.)  NP Finley increased Zoloft, but Ms. Briggs's other medications were unchanged.  (Tr. 480.)

On September 7, 2021, Ms. Briggs returned to Dr. Exten for follow up regarding her right ankle.  (Tr. 462-64.)  She reported that things were going well, and her pain was well controlled.  (Tr. 462.)  On examination, she was in no acute distress and looked her stated age.  (Tr. 463.)  Dr. Exten noted that Ms. Briggs was intact neurovascularly with no tenderness to palpation over the incision, but with decreased ankle motion.  (Tr. 463-64.)  X-rays of the right ankle revealed: postsurgical changes with intact hardware; incompletely healed distal fibular facture; and postreduction changes of the distal tibia with syndesmotic tightropes.  (Tr. 323-24, 464.)

On September 29, 2021, Ms. Briggs followed up with NP Finley for a telehealth medication management appointment.  (Tr. 482.)  She reported that she had not been the "greatest" because she was out of medication due to problems with her insurance; her mood had decreased, she was more irritable, and she was not sleeping well without her medications.  (*Id*.)  She reported that she had been able to straighten out the insurance issues and had restarted her medication for a week.  (*Id*.)  She denied suicidal ideation, plan or intent and denied hallucinations.  (*Id*.)  Except for a notation that Ms. Briggs had been more depressed and anxious since she was off her medications, mental status examination findings were generally unchanged from her prior visit with NP Finley.  (*Compare* Tr. 483 *with* Tr. 479.)

Ms. Briggs continued to treat with NP Finley in 2022, primarily via telehealth, with visits in January (Tr. 506-09), February (Tr. 502-05), March (Tr. 498-501), July (Tr. 597-99), October (Tr. 635-43), and November (Tr. 644-52).  On January 26, 2022, Ms. Briggs stated she was still feeling a "little depressed."  (Tr. 506.)  She felt her depression had to do with her and her sister's health problems and her recent disability denial.  (*Id*.)  She was alert and oriented on examination, with intact memory and fair insight, judgment, attention, and concentration.  (Tr. 507.)  Her speech, thought processes, and associations were normal, and her fund of knowledge

8

and language were intact.  (*Id*.)  NP Finley noted that she sounded slightly less dysthymic.  (*Id*.)
Ms. Briggs's medications—Zoloft, quetiapine, and hydroxyzine—were continued.  (Tr. 508.)

When Ms. Briggs met with NP Finley on February 22, 2022, she reported that she had
been "ok" and was taking her medication.  (Tr. 502.)  She denied hallucinations and negative
side effects.  (*Id*.)  She reported she needed a new case manager because her case manager was
no longer working at Catalyst.  (*Id*.)  Mental status examination findings were similar to those
observed in January 2022.  (*Compare* Tr. 503 *with* Tr. 507.)  NP Finley noted that Ms. Briggs
sounded slightly less dysthymic.  (Tr. 503.)

On March 21, 2022, Ms. Briggs reported to NP Finley that she had been doing "ok," and
she was compliant with her medication with no side effects.  (Tr. 498.)  She denied
hallucinations.  (*Id*.)  She reported a lack of motivation and said she felt tired all the time, but her
anxiety was "well controlled," she denied a depressed mood, and she was sleeping and eating
well.  (*Id*.)  Mental status examination findings were similar to her last appointment, except her
mood was reported as "good," whereas at her prior appointment her mood was described as
slightly less dysthymic.  (*Compare* Tr. 499 *with* Tr. 503.)  Zoloft was increased, and quetiapine
and hydroxyzine were continued.  (Tr. 500.)

When Ms. Briggs returned to NP Finley on July 18, 2022, she reported having less
motivation and feeling more depressed.  (Tr. 597.)  She also reported increased anxiety because
it was the time of year when she had ended up in the hospital during the past two years.  (*Id*.)
She denied suicidal ideation, plan, or intent, and denied hallucinations.  (*Id*.)  Mental status
examination findings were similar to her last appointment, except her mood was described as
dysthymic.  (*Compare* Tr. 597-98 *with* Tr. 499.)  NP Finley decreased Ms. Briggs's Zoloft dose,
added Wellbutrin XL, and continued quetiapine and hydroxyzine.  (Tr. 598-99.)

On September 2, 2022, Ms. Briggs met with Kayleigh Willeroy, QMHS, a case manager at Catalyst.  (Tr. 662-63.)  She reported she was "overall doing very well."  (Tr. 662.)  They discussed Ms. Briggs's home life, her relationship with her sister, and her pending disability claim.  (*Id*.)  It was noted that Ms. Briggs needed supportive listening to help her in coping with her stressors.  (*Id*.)  When Ms. Briggs met with Ms. Willeroy the following week, on September 9, 2022, she reported struggling with anxiety and following through on required tasks.  (Tr. 664.)  But she also reported doing well overall, and that she felt her relationship with her sister was on the mend.  (*Id*.)  She was using music as a coping mechanism.  (*Id*.)

On September 20, 2022, Ms. Briggs presented to neurologist Omar Ahmad, M.D., at Avita Health regarding her seizures and memory issues.  (Tr. 553-83.)  She reported having seizures since the age of 14 and recalled that her last seizure occurred in July 2021.  (Tr. 558.)  She also reported that she broke her right ankle and had a manic episode triggered by Prednisone in 2021.  (Tr. 558, 559.)  She said she could go years without a seizure, but could also have multiple seizures in one month.  (Tr. 559.)  She felt her seizures were triggered by stress.  (*Id*.)  She had never taken medication for her seizures.  (*Id*.)  She reported memory problems and said she often forgot what she was talking about in the middle of conversations.  (*Id*.)  She also said she could not recall many details from her childhood or her children's lives, noting that she thought she had PTSD stemming from growing up in an abusive household.  (*Id*.)  She said she had bipolar disorder and that her medications included Seroquel, Wellbutrin, and Zoloft.  (*Id*.)  On examination, Ms. Briggs was pleasant and cooperative.  (Tr. 563.)  She was anxious but alert and oriented.  (*Id*.)  Her recall was intact and her logic, language fluency, comprehension, attention, and speech were normal.  (*Id*.)  She had normal muscle bulk and tone, full strength and normal reflexes in the upper and lower extremities, intact sensation, normal coordination, and

normal gait. (Tr. 564-65.) Dr. Ahmad diagnosed: nonintractable epilepsy without status epilepticus, unspecified epilepsy type; PTSD; bipolar affective disorder, remission status unspecified; and memory difficulty. (Tr. 565.) As to her memory issues, Dr. Ahmad noted that she scored a 24/30 on the Montreal Cognitive Assessment (MoCA). (*Id.*) He felt she was "probably cognitively normal" and noted that "[m]ood may be a contributing factor." (*Id.*) He planned to check her B12 level. (*Id.*) He ordered an EEG and started her on lamotrigine, which he felt would also be helpful as a mood stabilizing medication. (*Id.*)

Ms. Briggs also met with Ms. Willeroy on September 20, 2022. (Tr. 666.) She reported that her neurologist said he thought her memory issues were related to repressed memories from childhood. (*Id.*) Ms. Briggs opened up to Ms. Willeroy regarding childhood trauma that she remembered. (*Id.*) She reported that she was doing well overall and was feeling better since she had been staying on top of her physical health. (*Id.*)

Ms. Briggs returned to NP Finley for medication management on October 17, 2022. (Tr. 635.) She reported she felt tired a lot and wanted to stay in bed. (*Id.*) She denied suicidal ideation, plan, or intent, and denied hallucinations. (*Id.*) She felt that recent changes in her medication did not make much of a difference. (*Id.*) On examination, Ms. Briggs's speech and thought processes were normal. (Tr. 637.) Her associations were logical. (*Id.*) She was oriented to person, place, time, and situation. (Tr. 638.) Her memory, attention, language, and fund of knowledge were intact. (*Id.*) Her mood was "dysthymic sounding." (*Id.*) Her medications were continued. (Tr. 639.) NP Finley noted that Ms. Briggs's depression, anxiety, and insomnia were the same. (*Id.*)

On November 1, 2022, Ms. Briggs met with Ms. Willeroy for case management services, after reaching out for an appointment because she was dealing with a difficult situation involving

a friend's illness.  (Tr. 669.)  They discussed coping mechanisms, including meditation, journaling, and baking.  (*Id*.)

On November 16, 2022, Ms. Briggs returned to NP Finley, reporting her mood had been "a little down."  (Tr. 644.)  She said she got a little more depressed "this time of year."  (*Id*.)  She denied suicidal ideation, plan, or intent, and denied hallucinations.  (*Id*.)  She said she did crafts or baked to help her feel better.  (Tr. 645.)  On examination, NP Finley described Ms. Briggs's appearance as overweight and well groomed.  (*Id*.)  Ms. Briggs's demeanor, eye contact, and activity were average.  (*Id*.)  Her speech and thought processes were normal.  (Tr. 645-46.)  Her associations were logical.  (Tr. 646.)  She was oriented to person, place, time, and situation.  (Tr. 647.)  Her judgment and insight were fair, and her memory, attention, language, and fund of knowledge were intact.  (*Id*.)  Her mood and affect were depressed.  (*Id*.)  NP Finley continued the prescriptions for quetiapine, hydroxyzine, Zoloft, and Wellbutrin XL, and noted that Ms. Briggs's depression was the same, but her anxiety and insomnia were improved.  (Tr. 648.)

On December 20, 2022, Ms. Willeroy met with Ms. Briggs at Ms. Briggs's home to provide support after she had lost a friend.  (Tr. 672.)  Ms. Willeroy provided supportive listening and discussed coping mechanisms.  (*Id*.)

On December 21, 2022, Ms. Briggs presented to Pamela Grassizk, APRN-CNP, at Avita Health to establish care as a new patient.  (Tr. 739, 743.)  She reported a history of arthritis, scoliosis, arms feeling heavy, hearing problems, problems with her hips that made it hard for her to walk properly, and difficulty remembering things.  (*Id*.)  She said she followed with a psychiatrist on a monthly basis for bipolar disorder, anxiety, depression, and manic episodes.  (Tr. 743.)  She also reported generalized pain throughout her body and said she used marijuana for pain management.  (*Id*.)  She reported a prior diagnosis, five years earlier, of rheumatoid

12

arthritis and requested a referral to Dr. Stainbrook for follow up on rheumatoid arthritis.  (Tr. 743-44.)  She was in the process of trying to get disability and asked CNP Grassizk to complete disability paperwork.  (Tr. 739, 743.)  On examination, Ms. Briggs was cooperative with a normal appearance.  (Tr. 747.)  She had normal range of motion in her neck and back, no edema in her legs, normal gait, full strength, and no neurological deficits.  (Tr. 747-48.)  She reported pain with active range of motion of the neck and bilateral upper extremities, but no difficulties were noted with active range of motion; there was flexion at the hips without difficulty; and she denied pain with moderate pressure palpation in the neck, shoulders, and spine.  (Tr. 747.)  Ms. Briggs's mood was anxious, but she was alert and oriented, and her affect, speech, behavior, thought content, and judgment were normal.  (Tr. 748-49.)  CNP Grassizk noted diagnoses that included unspecified fatigue, COPD, cervicalgia, and rheumatoid arthritis.  (Tr. 749-51.)  CNP Grassizk referred Ms. Briggs to a rheumatologist, ordered labs, and prescribed an inhaler for COPD, which CNP Grassizk indicated was chronic but stable.  (*Id*.)  CNP Grassizk stated that they would address Ms. Briggs's concerns regarding hearing, memory, and bilateral hip pain at a follow-up visit, and indicated she would complete disability paperwork.  (Tr. 751.)

On January 12, 2023, Ms. Briggs returned to CNP Grassizk for complaints of hip and shoulder pain, hearing problems, and memory loss.  (Tr. 683.)  She said she would be in the middle of a conversation and completely forget what was being said.  (*Id*.)  She also reported bilateral hip pain for 20 years, radiating to her midline low back.  (Tr. 687.)  Her pain was exacerbated by lying on either side, or by prolonged sitting or standing.  (*Id*.)  She sometimes needed assistance with standing or sitting and had difficulty with ambulation.  (*Id*.)  She also reported having bilateral shoulder pain for 15 years, radiating to her neck, down her back, and into her bilateral upper extremities.  (*Id*.)  She described her shoulder pain as intermittent, sharp,

and stabbing, and said the pain was exacerbated by any movement.  (*Id*.)  She said her pain affected her quality of life because she occasionally required assistance with activities of daily living due to limited active range of motion.  (*Id*.)  She also reported that her memory issues had gotten progressively worse over the last 3 years.  (*Id*.)  She said she was prediabetic, that her diet was unhealthy, and that she did not exercise because of bilateral hip pain.  (*Id*.)  She also reported fatigue.  (Tr. 688.)  On examination, Ms. Briggs was pleasant and cooperative.  (Tr. 689.)  Her physical examination findings were generally unremarkable, with normal hearing, pulmonary effort, breath sounds, and gait.  (Tr. 689-91.)  Her range of motion was normal, with the exception of limited active range of motion when raising her arms above her head.  (Tr. 689.)  Her psychiatric examination was also unremarkable, with normal mood, affect, speech, behavior, thought content, and judgment.  (Tr. 691.)  Ms. Briggs was diagnosed with bilateral hip pain, chronic bilateral shoulder pain, chronic midline low back pain without sciatica, mixed hyperlipidemia, brain fog, and prediabetes.  (*Id*.)  CNP Grassizk's recommendations included a referral to the pain clinic and physical therapy for Ms. Briggs's pain.  (*Id*.)

At a medication management appointment on January 18, 2023, Ms. Briggs reported to NP Finley she was "doing ok" and said her mood was "fair," rating her mood as an 8/10, with 10 being the best.  (Tr. 653.)  She denied suicidal ideation, plan, or intent, and denied hallucinations. (*Id*.)  She reported working on crafts or baking to help her feel better.  (*Id*.)  On examination, her demeanor was average, her speech and thought processes were normal, her associations were logical, her insight and judgment were fair, her memory, attention, concentration, and language were intact, her fund of knowledge was average and intact, and her mood was euthymic.  (Tr. 654-56.)  NP Finley noted that Ms. Briggs's anxiety, depression, and insomnia were improved, and continued Ms. Briggs's medications.  (Tr. 657.)

14

When Ms. Briggs returned to NP Finley on February 15, 2023, she reported she was "doing ok" and said her mood was "fair," rating her mood as an 7/10, with 10 being the best. (Tr. 626.)  She denied suicidal ideation, plan, or intent, and denied hallucinations.  (*Id*.)  She again reported working on crafts or baking to help her feel better, and mental status examination findings were similar to those observed during her January visit with NP Finley.  (*Compare* Tr. 627-30 *with* Tr. 654-56.)  NP Finley noted that Ms. Briggs's insomnia was the same and her anxiety and depression were improved, and continued Ms. Briggs's medications, which included Wellbutrin XL, Zoloft, hydroxyzine, and quetiapine.  (Tr. 630.)

**2.    Opinion Evidence**

**i.    Physical Impairment Opinion Evidence**

**a.    Treating Source Opinion**

On January 12, 2023, CNP Grassizk completed a Residual Functional Capacity Questionnaire – Physical.  (Tr. 510.)  She reported seeing Ms. Briggs every three months for thirty to forty-five minutes at a time and listed the following diagnoses: cervicalgia, dorsalgia, and rheumatoid arthritis (RA) involving multiple joints.  (*Id*.)  In the checklist style questionnaire, CNP Grassizk opined that Ms. Briggs could: sit for less than three hours; stand for less than one hour; walk for less than one hour; occasionally lift/carry ten pounds; never lift/carry more than ten pounds; never climb; occasionally squat and crawl; and frequently bend. (*Id*.)  She opined that Ms. Briggs's pain and other symptoms would frequently interfere with her ability to maintain the attention and concentration required to perform simple work tasks, and that it was likely Ms. Briggs would be absent from work four or more days due to her treatment or impairments.  (*Id*.)  She also opined that Ms. Briggs's impairments lasted or were expected to last at least twelve months.  (*Id*.)

15

### b.        Consultative Examiner's Opinion

On December 12, 2019, Ms. Briggs presented to Casey Norris, D.O., at Pro Medical Midwest for a physical consultative examination.  (Tr. 486-94.)  She reported applying for disability due to schizophrenia, bipolar disorder, anxiety, depression, insomnia, and rheumatoid arthritis.  (Tr. 487.)  She said she was diagnosed with rheumatoid arthritis four to five years earlier and that it caused diffuse pain.  (*Id*.)  She also reported that she was diagnosed with schizophrenia in July 2020 and with bipolar disorder in July 2021.  (*Id*.)  She felt her symptoms were "under fair control on medication."  (*Id*.)  She reported fracturing her right ankle in 2021 during a manic episode, and said her ankle was repaired surgically.  (*Id*.)

On examination, Ms. Briggs was well-groomed.  (Tr. 488.)  She was able to get on and off the examination table unassisted and without difficulty.  (*Id*.)  There was no clubbing, cyanosis, or edema in her extremities.  (*Id*.)  Peripheral pulses were 2+ throughout.  (*Id*.)  Ms. Briggs walked with a normal gait without the use of an assistive device.  (*Id*.)  She could walk heel to toe, on her heels, and on her toes.  (*Id*.)  She could hop and squat.  (*Id*.)  Straight leg raise testing was negative bilaterally and there was no musculoskeletal tenderness to palpation.  (*Id*.)  She had normal bulk and tone in all major muscle groups and 5/5 strength in the upper and lower extremities with proximal and distal muscle groups.  (*Id*.)  Muscle stretch reflexes were 2+ and symmetrical and there were no pathological reflexes on examination.  (*Id*.)  Ms. Briggs's sensation to pinprick and light touch was normal throughout and rapid alternating movements were within normal limits.  (*Id*.)  Finger-to-nose and heel-to-shin testing was normal bilaterally. (*Id*.)  Range of motion testing in the cervical and lumbar spine and upper and lower extremities showed no limitation.  (*Id*.)  Fine fingering and gross grip strength were normal.  (*Id*.)

Dr. Norris's impression was:

> This is a 45-year-old claimant with schizophrenia, bipolar disorder, and rheumatoid arthritis.  The claimant states that the symptoms are under fair control and there are no abnormalities on exam.  The claimant needs further psychological evaluation.  The claimant should be able to walk for five to six hours out of an eight-hour day.  That claimant could probably be on [her] feet for a combined total of six hours out of an eight-hour day.  The claimant probably could carry less than 40 pounds frequently and more than 50 pounds on occasion.  There are no other limitations in function.

(Tr. 488-89.)

### c.      State Agency Medical Consultants' Opinions

On initial review, state agency medical consultant Elizabeth Das, M.D., found on January 9, 2022, that Ms. Briggs had no severe physical impairments.  (Tr. 65, 74.)  But she nevertheless completed a Physical RFC Assessment opining that Ms. Briggs had the physical residual functional capacity to: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently climb ramps/stairs; and occasionally climb ladders/ ropes/ scaffolds.  (Tr. 76-77.)  On reconsideration, state agency medical consultant Mehr Siddiqui, M.D., affirmed Dr. Das's findings on April 20, 2022.  (Tr. 84-85, 86-88, 93-94, 95-97.)

### ii.      Mental Health Impairment Opinion Evidence

### a.      Treating Source Opinion

On January 23, 2023, NP Finley completed a Residual Functional Capacity Questionnaire – Mental.  (Tr. 624-25.)  She reported seeing Ms. Briggs monthly since August 2021, and that her medications included: quetiapine, Wellbutrin XL, hydroxyzine Hcl, and Zoloft.  (Tr. 624.)  In the check-box style questionnaire, NP Finley opined that Ms. Briggs had: moderate difficulties in interacting with others and in adapting or managing oneself; and marked difficulties in understanding, remembering, and applying information and maintaining concentration,

17

persistence, or pace.[7] (*Id.*) NP Finley opined that Ms. Briggs had: mild limitations in her ability to carry out very short and simple instructions and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; moderate limitations in her ability to respond appropriately to changes in the work setting; and marked limitations in her ability to remember locations and work-like procedures, to complete an eight-hour workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 625.)

NP Finley opined that Ms. Briggs's impairments or treatment could cause her to be absent from work for an average of four or more days a month. (Tr. 624.) In her summary of the clinical findings demonstrating the severity of Ms. Briggs's impairments and symptoms, and in the additional notes, opinions, and findings section of the questionnaire, NP Finley stated:

> [P]roblems [with] memory, forgets things in middle of conversation, alert and oriented, normal attention, logical thought process, trouble [with] concentration at times, no remarkable issue with her cranial nerves. [Patient's] mood can fluctuate at times as well as her level of anxiety, affecting her ability to appropriately carry out a consistent work schedule. Additionally, patient's medications can cause her to be drowsy.

(Tr. 624-25.)

### b.    State Agency Psychological Consultants' Opinions

On initial review, state agency psychological consultant Mary Hill, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 65-66, 74-75) and a Mental RFC Assessment (Tr. 68-69, 77-78) on November 6, 2011. In the PRT, Dr. Hill opined that Ms. Briggs had mild limitations in her ability to understand, remember, or apply information, and moderate limitations in her abilities to: interact with others; concentrate, persist, or maintain pace; and

---

[7] The available ratings were: "none-mild," "moderate," "marked," and "extreme." (Tr. 624.)

adapt or manage oneself.  (Tr. 65, 74.)  In the Mental RFC, Dr. Hill opined that Ms. Briggs

could: complete 1-3 step tasks with no requirement for rapid pace;[8] maintain superficial

interactions with others with no customer service duties;[9] and work in a setting with occasional

changes.  (Tr. 68-69, 77-78.)  On reconsideration, state agency psychological consultant Irma

Johnston, Ph.D., affirmed Dr. Hill's PRT findings and Mental RFC on April 28, 2022.  (Tr. 85,

88-89, 94, 97-98.)

**C.    Hearing Testimony**

**1.    Plaintiff's Testimony[10]**

Ms. Briggs testified in response to questioning by the ALJ and her representative at the

March 8, 2023 telephonic hearing.  (Tr. 43-53, 55.)  She provided testimony regarding her past

work experience.  (Tr. 43-47.)  She said she felt she could not work after her "hospitalization for

[her] ankle surgery and . . . mental health break" because her leg was not that stable and because

her mental health condition caused paranoia and made her think everybody was talking about

her; but she admitted that she was not receiving treatment to address the reported instability in

her leg.  (Tr. 48-49.)  She said she was hospitalized and diagnosed with schizophrenia in 2020

after she stopped taking her mental health medication and/or after taking Prednisone.  (Tr. 49-

50.)  She said she did not have symptoms of paranoia while working in the past.  (*Id.*)  She also

said that she was more isolated since taking medication for her mental health conditions.  (Tr.

50.)  She hardly left the house, even for groceries; she had her sister pick up whatever she

needed.  (*Id.*)  She typically only sat and watched television and cleaned the house during the

---

[8] Dr. Hill noted that Ms. Briggs was distractable, prepared meals, performed chores.  (Tr. 68, 77.)

[9] Dr. Hill noted that Ms. Briggs had some recent paranoia.  (Tr. 68-69, 77-78.)

[10] Ms. Briggs also completed a Function Report on October 26, 2021, which included information regarding her conditions, limitations, and daily activities.  (Tr. 246-53.)

day.  (*Id*.)  She reported no "psychosis issues" and no seizures since July 2021, but said she was still having problems with depression and anxiety.  (Tr. 52-53.)

Ms. Briggs said she was diagnosed with rheumatoid arthritis in 2018 or 2019 based on bloodwork.  (Tr. 51.)  She said she had not seen her doctor since 2019 because she moved, but also said that she was scheduled to see him the next day.  (*Id*.)

Ms. Briggs reported memory problems that worsened after she was hospitalized in 2021. (Tr. 52.)  To help her remember things, she said she had to write things down, set alarms, and rely on her sister.  (*Id*.)  Ms. Briggs had not had a driver's license since 2009 when her insurance lapsed.  (Tr. 50.)  Her family drove her where she needed to go, or she used a ride service through her insurance.  (Tr. 51.)

### 2.       Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing (Tr. 53-59), and classified Ms. Briggs's past relevant work as: (1) hand packager, an SVP 2 position that is generally performed at a medium exertion level but was performed by Ms. Briggs at light and medium exertion; and (2) home attendant, an SVP 3 position that was performed generally and by Ms. Briggs at a medium exertion level.[11]  (Tr. 54-56.)

In response to the ALJ's first hypothetical, the VE testified that an individual with the functional limitations described in the ALJ's RFC determination (Tr. 21, 56) could not perform Ms. Briggs's prior work, but that the individual could perform medium, unskilled jobs such as lab equipment cleaner, industrial cleaner, and laundry worker (Tr. 56-57).

For her second hypothetical, the ALJ asked the VE to consider the first hypothetical, except that the individual could perform a range of light work and occasionally climb ramps and

---

[11] The ALJ did not consider the customer complaints position as past relevant work because the position was an SVP 5 job and the VE testified that Ms. Briggs had not performed the job for long enough to learn it.  (Tr. 54-56.)

stairs, stoop, kneel, crouch, and crawl.  (Tr. 57.)  In response, the VE testified that Ms. Briggs's

past work would be eliminated but there were light, unskilled jobs that the individual could

perform, including mail clerk, housekeeping cleaner, and office helper.  (*Id.*)  The VE also

testified that the mail clerk and officer helper positions could be performed if the individual were

limited to standing for four hours and sitting for four hours.  (Tr. 58-59.)

If the social interaction limitation was modified from frequent to occasional, the VE

testified that the six jobs identified in response to the first two hypotheticals would remain

available.  (Tr. 58.)  The VE also testified that employer tolerance for off task time was up to

15% of the day, and that tolerance for absences was one to two absences per month, with no

more than fourteen absences in a year.  (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ must follow a five-step

sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, 416.920;.[12] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.     The ALJ's Decision

In her May 31, 2023 decision, the ALJ made the following findings:[13]

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2023.  (Tr. 18.)

---

[12] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[13] The ALJ's findings are summarized.

2.    The claimant has not engaged in substantial gainful activity since July 17, 2021, the alleged onset day.  (*Id*.)

3.    The claimant has the following severe impairments: obesity, bipolar disorder, post-traumatic stress disorder (PTSD), anxiety disorder, and cannabis use disorder. [14]  (*Id*.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19-20.)

5.    The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except she cannot: climb ladders, ropes, or scaffolds, work around hazards, such as unprotected heights, work in proximity to exposed, moving mechanical parts, or engage in occupational driving; she can: perform simple tasks without a production rate pace with simple judgment, interact frequently with others on matters limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution, and adapt to occasional changes.  (Tr. 21-26.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 26.)

7.    The claimant was born in 1975, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.)

8.    The claimant has at least a high school education.  (*Id*.)

9.    Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could perform, including lab equipment cleaner, laundry worker, and industrial cleaner.  (Tr. 26-27.)

Based on the above, the ALJ found Ms. Briggs was not under a disability, as defined in the Social Security Act, from July 17, 2021, through the date of the decision.  (Tr. 28.)

---

[14] The ALJ also found Ms. Briggs had non-severe impairments, including right ankle fracture, hyperlipidemia, and gastroesophageal reflux disease (GERD), and other reported conditions that were not medically determinable, including COPD/emphysema, elevated blood glucose, seizures, memory loss, hip and shoulder pain, hearing loss, rheumatoid arthritis, carpal tunnel syndrome.  (Tr. 18-19.)

## V.      Plaintiff's Arguments

Ms. Briggs presents one assignment of error: "The ALJ failed to evaluate the medical

opinions pursuant to the appropriate legal standards and failed to identify substantial evidence

supporting the mental RFC finding."  (ECF Doc. 9, pp. 1, 12.)  Specifically, she challenges the

ALJ's evaluation of the opinions rendered by NP Finley, CNP Gassizk, the state agency medical

and psychological consultants, and the consultative examiner (*id.* at pp. 12-24, ECF Doc. 12),

and argues that the ALJ erred in evaluating the subjective allegations (ECF Doc. 9, pp. 24-25).

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that she failed to apply the correct legal standards or made findings of fact unsupported by

substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th

Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct

legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th

Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard ... presupposes that there is a

zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: The ALJ Properly Evaluated the Medical Opinion Evidence and Supported the RFC Finding with Substantial Evidence**

In her sole assignment of error, Ms. Briggs argues that the ALJ erred in evaluating the medical opinion evidence and did not identify substantial evidence to support the RFC. (ECF Doc. 9, pp. 1, 12.) More specifically, she challenges the ALJ's evaluation of the opinions of NP Finley, CNP Gassizk, the state agency medical and psychological consultants, and the consultative examiner. (ECF Doc. 9, pp. 12-24, ECF Doc. 12.) She also argues that the ALJ erred in her evaluation of Ms. Briggs's subjective allegations because she failed to consider

25

whether there were reasonable justifications for Ms. Briggs's lack of care or delays in care. (ECF Doc. 9, pp. 24-25.)  The Commissioner responds that the ALJ reasonably evaluated the medical opinion evidence and subjective allegations.  (ECF Doc. 11, pp. 7-14.)  The undersigned turns first to the evaluation of the medical opinions, and then to the subjective allegations.

### 1.     Legal Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words,

"consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

### 2.     The ALJ Properly Evaluated NP Finley's Medical Opinion

The ALJ analyzed the persuasiveness of NP Finley's medical opinion as follows:

> The claimant's mental nurse practitioner completed a form at Exhibit 8F, indicating marked limitations with frequent absenteeism, among other things. However, she supports these selections by indicating that her mood can fluctuate, which can affect her ability to carry out a consistent work schedule, and that her medications can cause drowsiness. As noted above, the claimant frequently denies any medication[] side effects. While the record does show some mood changes, and some fatigue associated with insomnia, the source does not support the marked findings that would be reasonably necessary to find that those mood changes would prevent her from attending or focusing on work. The collateral record, as noted, shows generally normal mental status findings aside from "fair" insight, judgment, attention, and concentration, and mood changes, at times. Despite her reported fatigue, she does not present as drowsy, and is alert. A recent, detailed neurological examination showed her to be awake and alert, with normal attention, recall, logic, language fluency, comprehension, object naming, and repetition (Exhibit 7F/53). As this evaluation is much more detailed than the cognitive findings by Nurse Finley and is by a physician, I find them to be significantly inconsistent with her opinions and more persuasive. Therefore, as her opinions are neither well supported on the form or in her own mental status examinations, and are not consistent with the collateral record, including neurological examinations and the State Agency prior administrative medical findings, they are not persuasive.

(Tr. 25-26.)

Ms. Briggs argues that the ALJ's analysis of NP Finley's opinion is based on a misreading of the evidence and fails to identify actual inconsistencies between NP Finley's conclusions and the evidence.  (ECF Doc. 9, p. 14.)  More specifically, she argues: (1) the ALJ "appears to discount Nurse Finley's opinion because she was not a physician" and provides an incomplete and inaccurate description of a neurological examination that the ALJ described as "significantly inconsistent with [NP Finley's] opinions and more persuasive"; (2) the ALJ does not clearly explain how the mental status findings in the record are inconsistent with NP Finley's assessment of Mr. Briggs's limitations; and (3) both the neurological examination and other

27

evidence in the record "is consistent with Nurse Finley's explanation for the opinion of limitations." (ECF Doc. 9, pp. 15-19.)  The undersigned will address each argument in turn.

First, Ms. Briggs challenges the ALJ's statement that Dr. Ahmad's September 2022 neurological examination findings were "much more detailed than the cognitive findings by Nurse Finley and [were] by a physician" and her related conclusion that Dr. Ahmad's findings were "significantly inconsistent with [NP Finley's] opinions and more persuasive." (Tr. 25-26 (citing Tr. 563); *see* ECF Doc. 9, pp. 15-16.)  Specifically, she asserts that it is "irrelevant" that Dr. Ahmad's neurological examination was performed by a physician because "a physician and nurse are both considered medical sources." (ECF Doc. 9, p. 15.)  But she fails to explain how the ALJ's accurate reference to Dr. Ahmad's title amounted to error.  The regulations provide that an ALJ may consider the "specialization" of a medical source in assessing persuasiveness because "[t]he medical opinion . . . of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion . . . of a medical source who is not a specialist in the relevant area of specialty." 20 C.F.R. § 404.1520c(c)(4).  Dr. Ahmad's education as a physician is relevant to the ALJ's comparative examination of Dr. Ahmad's and NP Finley's cognitive findings.  The fact that Dr. Ahmad and NP Finley are both acceptable medical sources does not change this fact.

Ms. Briggs also asserts that the ALJ's summary of Dr. Ahmad's examination findings was "incomplete[] and inaccurate" because Dr. Ahmad noted a MoCA score of 24/30, which Ms. Briggs asserts is "consistent with a mild cognitive impairment." (ECF Doc. 9, p. 15.)  But Ms. Briggs has failed to show that this omission deprived the ALJ's analysis of the support of substantial evidence.  The ALJ found Dr. Ahmad's neurological examination included cognitive

28

findings that were "much more detailed than the cognitive findings by Nurse Finley," and explained that the exam showed Ms. Briggs "to be awake and alert, with normal attention, recall, logic, language fluency, comprehension, object naming, and repetition." (Tr. 26 (citing Tr. 563).) This was not a full and complete recitation of Dr. Ahmad's examination findings, but the ALJ was not required to include such a recitation. *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (an ALJ is not "required to discuss each piece of data in his opinion, so long as he consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006)). In arguing that the omission of the MoCA score specifically amounted to error, Ms. Briggs cites to a criminal defendant's allegations in an unpublished district court case for the proposition that the MoCA score "is consistent with a mild cognitive impairment." (ECF Doc. 9, p. 15 (citing *United States v. Gowder*, No. 6:17-CR-25-REW, 2020 WL 5542666, at *2 (E.D. Ky. Sept. 16, 2020), *aff'd*, No. 20-6117, 2021 WL 1328601 (6th Cir. Mar. 1, 2021).) But Dr. Ahmad's own assessment addressed Ms. Briggs's MoCA score as follows: "She scored 24/30 on the MoCA today. I think she is probably cognitively normal. Mood may be a contributing factor." (Tr. 565.) The undersigned concludes that Ms. Briggs has failed to demonstrate that the omission of the MoCA score deprived the ALJ's analysis of the support of substantial evidence.

Ms. Briggs's argument that NP Finley, as "a psychiatric nurse practitioner, would be better suited to provide an opinion on Plaintiff's mood and mental functioning given that her memory concerns were likely related to mood rather than a neurological impairment" does not change this analysis. (ECF Doc. 9, p. 16.) The question before this Court is not whether the record would support Ms. Briggs's preferred persuasiveness finding. Even if a preponderance of the evidence supports a finding that the opinion was persuasive, this Court cannot overturn the

29

ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406. Neither the reference to Dr. Ahmad's title as a "physician" nor the ALJ's failure to highlight Ms. Briggs's MoCA score deprive the ALJ's persuasiveness finding of the support of substantial evidence.

Second, Ms. Briggs challenges the ALJ's finding that NP Finley's treatment records do not support "the marked findings that would be reasonably necessary to find that those mood changes would prevent [Ms. Briggs] from attending to or focusing on work" because "[t]he collateral record, as noted, shows generally normal mental status findings aside from 'fair' insight, judgment, attention, and concentration, and mood changes, at times." (ECF Doc. 9, p. 17 (quoting Tr. 25-26).) Ms. Briggs argues that "it is unclear how the abnormal findings constitute an inconsistency in the record." (*Id.*) In other words, she agrees that the mental status findings are abnormal only as to "fair" insight, judgment, attention, and concentration, and some mood changes, but asserts that the ALJ erred when she did not "explain how the findings contradict Nurse Finley's assessment of limitations." (*Id.* at p. 18.) The Commissioner responds that these arguments "do not withstand scrutiny when reading the ALJ's decision as a whole" (ECF Doc. 11, p. 8), given the ALJ's well-supported findings that NP Findley's "opinions are neither well supported on the [opinion] form or in her own mental status examinations, and are not consistent with the collateral record, including the neurological examinations and the State Agency prior administrative findings" (Tr. 26).

An ALJ may rely on information articulated earlier in a decision to support her findings, and need not rearticulate that information in her later analysis. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Here, the ALJ provided a detailed summary of Ms. Briggs's mental health treatment

records, including NP Finley's records (Tr. 22-23), before finding that the evidence did not

support Ms. Briggs's reported level of limitation, explaining, in pertinent part:

> Mentally, the records document an acute psychiatric exacerbation leading to a brief hospitalization; however, the claimant admitted to not sleeping for five days and to not taking her psychiatric medication since moving back to Ohio from West Virginia []. By the time of discharge, she improved, reported no adverse medication side effects, and she was attending groups and attending to her activities of daily living. In follow up she noted feeling better after being on medication for over a month []. Generally, she exhibited mildly abnormal to normal mental status examinations, with decreasing to no paranoid thoughts []. She repeatedly exhibited intact attention, memory, and concentration. She was generally noted to have fair insight and judgment. She also reported coping skills such as baking, music, and crafting []. Her own statements are not entirely consistent. . . . She reported paranoid ideation (the belief that others were talking about her) but interacted appropriately with treatment providers. She reported memory issues but was able to provide histories and manage decisions related to her medical and psychiatric care. Regarding course of treatment, . . . [o]n the mental health side, she has engaged in medication management and had the one hospitalization, which she attributed at hearing to being given high doses of prednisone for bronchitis, but with the inpatient record indicating failure to comply with treatment after moving. She admitted at hearing that she had not experienced psychosis since July 2021 and no seizure like activity since that time either. Also, her treatment has been largely successful. While her symptoms of anxiety and depression were not fully resolved, they have waxed and waned to a mild to moderate degree. She does not report consistent precipitating or aggravating factors, other than her belief that in a work setting she would think others were talking about her and low motivation to leave home. She does not report significant or consistent medication side effects since the alleged onset date.
>
> In summary, except for one acute exacerbation complicated by lack of sleep and noncompliance with prescribed medication, the claimant's mental status examinations have been relatively benign, showing some variability in mood, with both anxiety and depression noted at times, worse at times due to insurance issues affecting her ability to obtain medication [] and relationship stressors [], and, at times difficulty with transportation []. She also reported some fatigue and low motivation at times []. She consistently was indicated to have "fair" insight, judgment, attention, and concentration with variability in terms of memory.

(Tr. 23-24 (citations omitted).)  In the context of the whole ALJ decision, the undersigned finds

Ms. Briggs has failed to demonstrate that the ALJ did not adequately explain how Ms. Briggs's

mental status findings—which were abnormal in only limited ways—contradicted NP Finley's

opinion that Ms. Briggs had marked limitations in various areas of mental functioning.

Finally, Ms. Briggs makes several arguments to the effect that Dr. Ahmed's neurological examination and other noted evidence in the record were "consistent with Nurse Finley's explanation for the opinion of limitations." (ECF Doc. 9, pp. 16-17.)  The Commissioner responds that these arguments amount to "reciting facts that are most in [Ms. Briggs's] favor and asking the Court to reweigh the evidence." (ECF Doc. 11, p. 7.)  The undersigned agrees that such arguments amount to a request for this Court to weigh the evidence do novo, which is not the Court's role.  *See Garner*, 745 F.2d at 387 (indicating that a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility").  As noted above, even if the evidence would support a finding that NP Findley's opinion was persuasive, this Court cannot overturn the ALJ's contrary finding "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Here, the undersigned finds that Ms. Briggs has failed to demonstrate that the ALJ's persuasiveness finding for NP Finley's opinion lacked the support of substantial evidence.

For the reasons set forth above, the undersigned concludes that the ALJ sufficiently explained her persuasiveness findings as to NP Finley's opinion, and that Ms. Briggs has failed to show that those findings lacked the support of substantial evidence.

### 3. The ALJ Properly Evaluated CNP Gassizk's Medical Opinion

The ALJ analyzed the persuasiveness of CNP Gassizk's medical opinion as follows:

The claimant's primary care nurse practitioner completed a form at Exhibit 6F dated January 12, 2023. The treatment records indicate that she agreed to complete this paperwork after only an initial visit (Exhibit 10F/75). The opinions on this form are not well supported on the form, which is primarily check marks, nor is it supported by her reported diagnoses, including neck pain (cervicalgia), back pain (dorsalgia), and rheumatoid arthritis involving multiple joints (which, as noted above, is not a medically determinable impairment as there is a lack of objective signs and findings). She also reports seeing the claimant every three months, but this is misleading as she does not point out that she had only seen the claimant twice, on December 21, 2022, and January 12, 2023 (Exhibit 10F). Given the lack

of established physical impairments in this record, I find that this form is not persuasive, as it is neither well supported nor consistent with the collateral record, including the sources' own objective examinations, which indicate minimal abnormal findings.

(Tr. 25.)  Ms. Briggs argues that the ALJ erred in making these findings because her "reasons are factually inaccurate" and she "inconsistently applied her reasoning."  (ECF Doc. 8, p. 19.) Specifically, she argues: (1) the ALJ noted that CNP Grassizk had completed the opinion "after only an initial visit," but previously "rejected" NP Finley's opinion in favor of a "one-time neurological examination"; (2) the ALJ erred in finding the opinion not supported by noted diagnoses of neck pain, back pain, and rheumatoid arthritis, since treatment notes also mentioned those conditions and complaints; and (3) the ALJ's finding that the opinions were "not well supported on the form, which is primarily check marks" neglected to recognize that CNP Grassizk's opinions were supported by her treatment notes.  (ECF Doc. 9, pp. 19-22.)  The undersigned will address each argument in turn.

First, Ms. Briggs argues that the ALJ applied inconsistent reasoning when she noted that CNP Grassizk "'agreed to complete the paperwork after only an initial visit'" while separately discounting NP Finley's opinion because it was inconsistent with Dr. Ahmed's "one-time neurological examination."  (ECF Doc. 9, p. 19 (quoting Tr. 25, 26).)  But the regulations specifically provide that the ALJ may consider the length, purpose, and extent of a treating relationship, and the frequency of examinations, in assessing persuasiveness because those factors may help to demonstrate a medical source's "level of knowledge" and "longitudinal understanding" of the medical impairments.  *See* 20 C.F.R. § 404.1520c(c)(3)(i)-(iv).  Thus, it was relevant and appropriate for the ALJ to note the length of time CNP Grassizk had treated Ms. Briggs before rendering her opinion.  The ALJ's separate finding that a different one-time examination was persuasive and inconsistent with another opinion does not change this fact.

33

Second, Ms. Briggs challenges the ALJ's finding that CNP Grassizk's opinions were "not well supported . . . by her reported diagnoses, including neck pain (cervicalgia), back pain (dorsalgia), and rheumatoid arthritis involving multiple joints (which, as noted above, is not a medically determinable impairment as there is a lack of objective signs and findings)."  (Tr. 25; *see* ECF Doc. 9, pp. 19-20.)  Ms. Briggs argues that CNP Grassizk's reliance on the described diagnoses was "supported by [Ms. Briggs's] treatment notes and consistent with other treatment notes in the record," and that the ALJ's failure to consider those records therefore amounted to a failure to address the consistency of CNP Grassizk's opinion with other evidence.  (*Id*.)  But the ALJ had already explained at Step Two that neither "pain" nor "rheumatoid arthritis" had been properly established to be "medically determinable impairments," stating:

> The claimant saw her primary care provider with complaints of hip and shoulder pain and hearing loss; however, the only diagnosis was "pain." There were some mild abnormal examination findings, such as limited active range of motion and tenderness; however, the diagnosed "cervicalgia" which means neck pain[] is a symptom, and not an impairment. The claimant reported having a diagnosis of rheumatoid arthritis, her primary care provider appeared to include this in the assessment, and he referred her to rheumatology; however, there were no objective signs or findings to support this (no abnormal laboratory markers, no synovitis on examination, etc.) and the diagnosis, instead, appears to be based only on her reported history [].

(Tr. 19 (citation omitted).)  Thus, the ALJ did not fail to consider Ms. Briggs's reported history of pain and rheumatoid arthritis, but instead appropriately concluded based on the medical records that Ms. Briggs had not met her burden to show that the specified conditions were "medically determinable."[15]  *See* 20 C.F.R. § 404.1521 (stating "impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically

---

[15] Ms. Briggs has not presented any developed argument challenging the ALJ's Step Two findings, and the undersigned finds any such argument has been waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source," and that SSA will not use a "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)"). Consistent with the ALJ's findings at Step Two, the records cited by Ms. Briggs in support of this argument are limited to subjective complaints and subjective reports regarding her medical history. (*See* Tr. 454, 455, 470; ECF Doc. 9, pp. 19-20 (citing same).) Ms. Briggs has thus failed to show that the ALJ lacked substantial evidence to support her finding that CNP Grassizk's opinion was "not well supported" by the diagnoses of pain and arthritis.

Finally, Ms. Briggs challenges the ALJ's finding that CNP Grassizk's opinions were "not well supported on the form, which is primarily check marks." (ECF Doc. 9, pp. 20-21.) "As a general matter, an ALJ may properly give little weight to a medical source's check-box form of functional limitations when it does not cite clinical test results, observations, or other objective findings." *Kreilach v. Comm'r of Soc. Sec.*, 621 F. Supp. 3d 836, 847 (N.D. Ohio 2022) (citing *Ellars v. Commissioner of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (collecting cases)). Here, Ms. Briggs does not argue that the ALJ erred in noting the use of a checkbox form, but that "the 'supporting explanations' provided on the form itself [are] only on[e] portion of the supportability factor" and that CNP Grassizk "provided support for her opinion of limitations" in her treatment notes. (ECF Doc. 9, p. 20.) In support, she cites primarily to her own subjective reports to CNP Grassizk (*id*.), noting only the following abnormal examination findings: pain with active range of motion of the neck and bilateral upper extremities (Tr. 747); anxious mood (Tr. 748); and limited active range of motion with raising bilateral arms above head (Tr. 689). (ECF Doc. 9, p. 21.) Even taking those findings into account, the ALJ's explanation makes it clear that she did not only discount CNP Grassizk's opinion because it was made on a checkbox

form; instead, she found the form "neither well supported nor consistent with the collateral record, including the sources' own objective examinations, which indicate minimal abnormal findings." (Tr. 25.)  Thus, the ALJ acknowledged Ms. Briggs's minimal abnormal findings on examination and Ms. Briggs has failed to show that the ALJ's findings on this issue lacked the support of substantial evidence.

For the reasons set forth above, the undersigned concludes that the ALJ sufficiently explained her persuasiveness findings as to CNP Grassizk's opinion, that her stated reasons are not factually inaccurate, and that Ms. Briggs has failed to show that the ALJ's persuasiveness findings lacked the support of substantial evidence.

### 4.     The ALJ Properly Evaluated the State Agency Consultants' Opinions

Ms. Briggs makes broader and more general challenges to the ALJ's findings regarding the medical opinions of the state agency medical and psychological consultants and the consultative medical examiner.  For the opinions of the medical consultants and consultative medical examiner—Drs. Norris, Siddiqui, and Das—Ms. Briggs argues that the ALJ's physical RFC "is unsupported" because the ALJ found the state agency and consultative medical opinions unpersuasive but "never explained the basis for the findings." (ECF Doc. 9, pp. 22-23.)  For the opinions of the psychological consultants—Drs. Hill and Johnston—Ms. Briggs argues the ALJ erred when she said she found the opinions "'persuasive in general and . . . adopted consistent limitations,'" but then "reduced the severity of the limitations without adequate rationales" in the mental RFC.  (*Id.* at pp. 23-24.)  The undersigned will address each argument in turn.

### i.     Substantial Evidence Supports the ALJ's Physical RFC

Ms. Briggs makes a general, conclusory argument that the ALJ "never explained" her basis for adopting a medium exertional RFC (or for finding obesity to be a severe physical

impairment) despite finding the opinions of Drs. Norris, Siddiqui, and Das unpersuasive.  (ECF Doc. 9, pp. 22-23.)  Although the argument is underdeveloped, Ms. Briggs's reference to the function of medical experts in interpreting "raw medical data" (*id.*) suggests she intends to argue that the ALJ's physical RFC limitations lack the support of substantial evidence because the RFC limitations she adopted were not based on a "persuasive" medical opinion.[16]

Although an ALJ must determine the RFC based on the relevant evidence in the record, including medical opinion evidence, an ALJ is "not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see* 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c).  Indeed, the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (citing *Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).  If ALJs were required to base their RFCs on medical opinions, the Sixth Circuit has observed that the requirement could confer on providers "the authority to make the determination or decision about whether an individual is under a disability," which "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."  *Rudd*, 531 F. App'x at 728 (internal quotation and citation omitted); *see also Livingston v. Comm'r of Soc. Sec.*, 776 F. App'x 897, 901 (6th Cir. 2019) ("To the extent that [a] 'lay opinion' critique reflects discomfort with the ALJ's evaluating functional capabilities at all, that, of course, is precisely the ALJ's

---

[16] To the extent Ms. Briggs intended to argue that the ALJ's explanation of her persuasiveness findings was lacking, the undersigned finds the argument underdeveloped and waived.  *McPherson*, 125 F.3d at 995-96.  It is also clear from the written decision that the ALJ provided detailed explanations to support her findings that the opinions were unpersuasive (Tr. 24-25) and those findings were supported by the written decision as a whole (Tr. 15-28).

role.") (internal citation omitted); *Poe*, 342 F. App'x at 157 (finding "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").

Here, the ALJ explained her reasons for finding certain physical impairments to be nonsevere or not medically determinable (Tr. 18-19), considered Ms. Briggs's subjective allegations and stated her reasons for finding them inconsistent with the records (Tr. 21-24), identified the records supporting obesity as a severe medically determinable impairment (Tr. 23), noted Ms. Briggs's lack of treatment for her physical impairments "outside of acute treatment for her ankle fracture" and failure to pursue even conservative follow-up treatment for that condition (*id.*), found the state agency medical consultants' assessment of a light RFC to be inconsistent with their failure to identify a single medically determinable physical impairment on which to base those limitations (Tr. 24-25), also found the consultative medical examiner's assessment of physical limitations to be inconsistent with his normal examination findings and failure to identify a medically determinable physical impairment (*id.*), and nevertheless found some physical limitations to be appropriate in light of Ms. Briggs's severe physical impairment of obesity "in combination with her mental impairments, particularly considering some complaints of sleep issues and fatigue" (Tr. 25). The ALJ neither interpreted raw medical data nor failed to explain the basis for her physical RFC limitations. Ms. Briggs has therefore failed to demonstrate that the ALJ lacked substantial evidence to support her physical RFC.

For the reasons set forth above, the undersigned concludes that the ALJ sufficiently explained her findings as to the medical opinions of Drs. Norris, Siddiqui, and Das, and the physical RFC, and that Ms. Briggs has not met her burden to show that the ALJ's medical opinion findings or physical RFC assessment lacked the support of substantial evidence.

ii.    **Substantial Evidence Supports the ALJ's Mental RFC Assessment**

As to the medical opinions of the state agency psychological consultants, Ms. Briggs argues that the ALJ erred when she said she found the opinions "'persuasive in general and . . . adopted consistent limitations,'" but then "reduced the severity of the limitations without adequate rationales." (ECF Doc. 9, pp. 23-24.) Specifically, she asserts that the ALJ failed to adequately explain why she: (1) reduced a limitation from "one to three step tasks" to "simple tasks"; and (2) changed a limitation from "superficial interactions with others" with "[n]o customer service duties" to "interact[ing] freely with others on matters limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution." (*Compare* Tr. 21 *with* Tr. 68-69; *see* ECF Doc. 9, pp. 23-24.)

As discussed above, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe*, 342 F. App'x at 157. Even where an opinion was given great weight, the Sixth Circuit held that "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Nevertheless, Social Security Ruling (SSR) 96-8p requires ALJs to consider all medical opinions in the RFC assessment and, where the assessment "conflicts with an opinion from a medical source," the ALJ "must explain why the opinion was not adopted." SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).

Ms. Briggs argues first that the ALJ failed to provide an adequate rationale for changing the limitations from "1-3 step tasks" in the state agency consultants' opinions (Tr. 68) to "simple tasks" in the mental RFC (Tr. 21). (ECF Doc. 9, p. 23.) In support, she cites to an unpublished

district court decision that cited cases taking both sides on the question whether there is a real

distinction between "simple tasks and 1-2 step tasks." *See Green v. Comm'r of Soc. Sec.*, No.

3:20-CV-01623-JGC, 2022 WL 610643, at *4 (N.D. Ohio Mar. 2, 2022). Ultimately, the *Green*

court found that it need not resolve the question "whether the two concepts are distinct" because

the ALJ "did not explain why she decided to deviate from" the 1-2 step task limitation. *Id.*

       Here, in contrast, the ALJ offered a specific explanation for deviating from the language

of the state agency consultants, stating in pertinent part:

> I have adopted generally the same limitations [as the State Agency psychological
> consultants], <u>but have restricted the claimant to simple tasks, rather than one to
> three step tasks, given that nearly any task can be further divided into sub-steps,
> rendering this an unhelpful way to describe complexity</u>. . . . In sum, while I did not
> adopt the State Agency findings verbatim, I find them persuasive in general and
> have adopted consistent limitations. The State Agency supported its findings with
> references to the record, and they remain mostly consistent with the collateral
> record at the hearing level, which, as noted, contains typically normal mental status
> findings with some mood lability and "fair" insight, judgment, attention, and
> concentration.

(Tr. 25 (emphasis added).) Given the ALJ's clear explanation for the changed language, this

Court need not conclusively determine whether an RFC limitation to "simple tasks" conflicts

with a state agency limitation to "1-3 step tasks" as contemplated in SSR 96-8p, since the ALJ

has complied with any requirement that she "explain why the opinion was not adopted."[17] SSR

96-8p, 61 Fed. Reg. at 34478. Considering that the ALJ found the state agency opinions no more

than "persuasive in general" and then clearly explained her reasons for adopting a limitation to

"simple tasks" instead of "1-3 step tasks," the undersigned concludes that Ms. Briggs has failed

to demonstrate that the ALJ reduced the severity of her mental RFC limitations without

providing an adequate rationale for the change.

---

[17] Although Ms. Briggs argues that the ALJ's explanation is inadequate because the "finding of 'one to three step tasks' is a vocational term," she offers no legal or regulatory authority to support this assertion or elucidate why or how the ALJ's explanation was inadequate. (*See* ECF Doc. 9, p. 23.)

Ms. Briggs argues next that the ALJ altered the state agency psychological consultants' social interaction limitations without sufficient explanation.  (ECF Doc. 9, pp. 23-24.)  The state agency psychological consultants limited Ms. Briggs to "superficial interactions with others" with "[n]o customer service duties" (Tr. 68-69, 77-78, 88, 97), but the ALJ instead adopted a mental RFC limiting Ms. Briggs to "interact[ing] frequently with others on matters limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution" (Tr. 21.)  In adopting this language, the ALJ explained: "I have limited the nature of interaction to preclude more stressful and difficult interactions, which is consistent with the State Agency limit to 'superficial' without customer service duties (resolution of complaints) but added a limitation on the quantity of interaction as well, given some mood lability, as noted."  (Tr. 25.)

Ms. Briggs argues that it remains unclear from the ALJ's explanation "why the record supports frequent interactions" and "'whether the ALJ intended her RFC limitations to effectuate the psychological consultants' limitations, or instead concluded that the record did not fully support the consultants' stated limitations.'"  (ECF Doc. 9, p. 23 (quoting *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *17 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted sub nom.* No. 3:20-CV-2370, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022) (emphasis omitted).)  On the contrary, the ALJ's language clearly reflects that she "added a limitation on the quantity of interaction" on top of the limitations outlined in the state agency opinions, to address treatment records showing "some mood lability."  (Tr. 25.)  The undersigned therefore finds Ms. Briggs has failed to demonstrate that the ALJ did not provide an adequate rationale for adding additional social interaction limitations to the mental RFC.  Further, since the added limitation was more restrictive than the state agency psychological consultants' opinions, Ms. Briggs has failed to show how the added limitation harmed her.

For the reasons set forth above, the undersigned concludes that the ALJ sufficiently explained her findings regarding the medical opinions of the state agency psychological consultants and the mental RFC, consistent with the requirements of SSR 96-8p, and that Ms. Briggs has not met her burden to show that the ALJ's medical opinion findings or mental RFC assessment lacked the support of substantial evidence.

5.      **The ALJ Properly Evaluated Plaintiff's Subjective Allegations**

In her final argument, Ms. Briggs asserts that the ALJ erred in assessing her subjective allegations because the ALJ made "multiple references to lack of treatment throughout the decision but failed to consider whether there were reasonable justifications for lack of care." (ECF Doc. 9, pp. 24-25.)  In support, she notes that a failure to seek treatment can be a symptom of some mental disorders, and that noncompliance with psychiatric medications can be a result of an underlying mental impairment.  (*Id.*)  She also notes that she had documented issues with insurance and finding doctors.  (*Id.* at p. 25.)  The Commissioner responds that the ALJ did not mention a lack of mental health treatment in her written decision, "only not[ing] a lack of treatment for her physical impairments (which is borne out by the record)."  (ECF Doc. 11, p. 14 (citing Tr. 23).)  Further, the Commissioner notes that the ALJ's only reference to medication noncompliance acknowledged that it related to "an insurance issue."  (*Id.* (citing Tr. 22, 482).)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to

which they limit the claimant's ability to perform work-related activities. *See* SSR 16-3p, 82 Fed

Reg. 49462, 49463; *Rogers,* 486 F.3d at 247. Relevant factors to be considered in evaluating the

intensity and persistence of symptoms include daily activities, types and effectiveness of

medications, treatment received to address symptoms, and other factors concerning a claimant's

functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed.

Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

     In considering treatments received under SSR 16-3p, the ruling advises: "[I]f the

frequency or extent of the treatment sought by an individual is not comparable with the degree of

the individual's subjective complaints, or if the individual fails to follow prescribed treatment

that might improve symptoms, [the SSA] may find the alleged intensity and persistence of an

individual's symptoms are inconsistent with the overall evidence of record." 82 Fed Reg. 49462,

49466. But the SSA "will not find an individual's symptoms inconsistent with the evidence in

the record on this basis without considering possible reasons . . . she may not comply with

treatment or seek treatment consistent with the degree of . . . her complaints." *Id.*

     Here, the ALJ considered Ms. Briggs's subjective allegations and concluded that her

"medically determinable impairments could reasonably be expected to cause at least some of the

alleged symptoms," but nevertheless found her "statements concerning the intensity, persistence

and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence

and other evidence in the record." (Tr. 20-21.) In support of this finding, the ALJ explained:

> [T]he claimant in this case does have severe medically determinable impairments.
> However, a careful review of the record does not disclose sufficient objective
> medical evidence and other evidence to substantiate the severity of the symptoms
> and degree of functional limitations alleged by the claimant. The objective evidence
> fails to document the presence of any impairment or combination of impairments
> that could reasonably be expected to result in symptoms of such a severity or
> frequency as to preclude the range of work described above.

43

In addition to the general lack of objective evidence, the other evidence of record does not support the claimant's subjective complaints. <u>Mentally, the records document an acute psychiatric exacerbation leading to a brief hospitalization; however, the claimant admitted to not sleeping for five days and to not taking her psychiatric medication since moving back to Ohio from West Virginia</u> []. By the time of discharge, she improved, reported no adverse medication side effects, and she was attending groups and attending to her activities of daily living. <u>In follow up she noted feeling better after being on medication for over a month</u> []. Generally, she exhibited mildly abnormal to normal mental status examinations, with decreasing to no paranoid thoughts []. She repeatedly exhibited intact attention, memory, and concentration. She was generally noted to have fair insight and judgment. She also reported coping skills such as baking, music, and crafting []. Her own statements are not entirely consistent. <u>While at hearing she reported ongoing issues with her right ankle, she conceded that she has not followed up for any treatment, including conservative measures such as physical therapy.</u> She reported paranoid ideation (the belief that others were talking about her) but interacted appropriately with treatment providers. She reported memory issues but was able to provide histories and manage decisions related to her medical and psychiatric care. <u>Regarding course of treatment, there is almost none regarding her physical impairments, outside of acute treatment for her ankle fracture.</u> <u>On the mental health side, she has engaged in medication management and had the one hospitalization, which she attributed at hearing to being given high doses of prednisone for bronchitis, but with the inpatient record indicating failure to comply with treatment after moving.</u> She admitted at hearing that she had not experienced psychosis since July 2021 and no seizure like activity since that time either. Also, her treatment has been largely successful. While her symptoms of anxiety and depression were not fully resolved, they have waxed and waned to a mild to moderate degree. She does not report consistent precipitating or aggravating factors, other than her belief that in a work setting she would think others were talking about her and low motivation to leave home. She does not report significant or consistent medication side effects since the alleged onset date.

(Tr. 23-24 (emphasis added; citations omitted).)  In her prior discussion of the medical records,

the ALJ had also noted:

At the end of September 2021, the claimant reported her mood had decreased and she was more irritable and not sleeping well; however, <u>she indicated that this was because she had an insurance issue and was out of her medication</u> [].  Still, her mental status examination remained generally within normal limits [].

(Tr. 22 (citing Tr. 482, 483) (emphasis added).)

As reflected in the highlighted text above, the ALJ accurately described the context of the

only two noted instances of psychiatric medication noncompliance—i.e., not taking medications

44

following a move and due to an insurance issue—and also noted Ms. Briggs' improvement after a month back on medications, her normal mental status findings even after the insurance issue interfered with her medications, and the overall waxing and waning of her symptoms only "to a mild to moderate degree." (Tr. 22-24.)  The ALJ also accurately observed that Ms. Briggs did not even pursue conservative follow-up treatment for her physical symptoms.  (*Id.*)  In this context, the undersigned finds Ms. Briggs's argument that "[t]he ALJ did not consider the reasons why Plaintiff lacked care or had delays in care" to be unsupported and without merit.

For the reasons set forth above, the undersigned concludes that the ALJ provided an adequate explanation for her finding that Ms. Briggs's subjective complaints were not entirely consistent with the evidence, and that Ms. Briggs has not met her burden to show that the ALJ's findings as to the subjective complaints lacked the support of substantial evidence.

The undersigned finds that Ms. Briggs's sole assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


May 7, 2025


/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).